## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **09-00389-jw**
Adversary Proceeding Number:  **09-80134-jw**

## ORDER

The relief set forth on the following pages, for a total of 13 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**02/25/2010**



*John E. Waites* (signature)

Chief US Bankruptcy Court Judge
District of South Carolina

Entered: 02/25/2010

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC,<br><br><div align="right">Debtor(s).</div> | C/A No. 09-00389-JW<br><br>Adv. Pro. No. 09-80134-JW<br><br>Chapter 11 |
| Carolina Shores, LLC,<br><br><div align="right">Plaintiff(s),</div><br>v.<br><br>William R. Dixon, Jr.; and Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC,<br><br><div align="right">Defendant(s).</div> | **ORDER GRANTING CAROLINA SHORES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This matter comes before the Court on a Motion for Partial Summary Judgment ("Motion") filed by Carolina Shores, LLC ("Carolina Shores"). Robert C. Onorato, as Trustee for Daufuskie Island Properties, LLC ("Trustee"), filed a response supporting the Motion, and William R. Dixon, Jr. ("Dixon") filed a response in opposition. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Based on the parties' pleadings and presentations to the Court, it appears that the following facts are undisputed.

**UNDISPUTED FACTS**

1.    In 2002, Daufuskie Island Properties, LLC ("Debtor") was created for the purpose of purchasing, owning, and operating certain property located on Daufuskie Island, South Carolina. Dixon and his wife are the two sole members of Debtor.

2.    At or around the same time, Carolina Shores was created as an investment vehicle in order to raise capital to be lent to Debtor for the purchase of the property on Daufuskie

Island.[1]

3.      On or about May or June of 2002, and as evidenced by deeds recorded in June 4, 2002, in Beaufort County, Debtor purchased certain property on Daufuskie Island (the "Property").

4.      At the time Debtor purchased the Property, it assumed obligations under two mortgages, both in favor of Club Financial Corp ("CFC").  The first mortgage, securing a note in the principal amount of $18,000,000, was originally recorded on May 28, 2002, and subsequently amended and restated and recorded on June 4, 2002, in Beaufort County (the "CFC First Mortgage").

5.      The second mortgage (the "CFC Second Mortgage") secured a note in the principal amount of $20,000,000 and was expressly subordinate to the CFC First Mortgage by its terms.  The CFC Second Mortgage was recorded on May 29, 2002, in Beaufort County.

6.      On May 14, 2002, Debtor executed a note in favor of Carolina Shores (the "CS Note") in the principal amount of $12,700,000, plus interest and a participation interest as specified by its terms, with a maturity date of December 31, 2032.  The CS Note provides that it "is secured by a second mortgage on the Property."

7.      In order to secure the CS Note, the CFC Second Mortgage was assigned to Carolina Shores ("CS Assignment").  The CS Assignment and Debtor's assumption of the CFC Second Mortgage ("Debtor Assumption") were recorded in Beaufort County on June 4, 2002.

8.      On the same day as the CS Assignment, Carolina Shores entered into a

---

[1] An August 2, 2002 memorandum authored by Dixon ("Carolina Shores Memo") describes the creation of Carolina Shores with the purpose of "[f]inancing for the purchase and ongoing operation and development of the property."  In a Private Placement Memorandum dated July 22, 2002 ("PPM"), Carolina Shores is described as having the purpose of "pay[ing] a portion of the $22,000,000 effective purchase price of the Property, to provide reserves for certain projected operating and capital expenditures, to provide a substantial additional reserve for operational contingencies and capital opportunities and to pay the costs of this offering."

subordination agreement with Debtor and CFC ("CFC Subordination Agreement"), whereby Carolina Shores expressly agreed to subordinate the CFC Second Mortgage to the CFC First Mortgage "in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by all parties."  Carolina Shores does not dispute the validity of the CFC Subordination Agreement, which was duly recorded and executed with exchange of recited consideration.

9.      The CFC Second Mortgage, CS Assignment, and Debtor Assumption (collectively referred to as the "CS Mortgage") serve as security for the CS Note and grant Carolina Shores a security interest in a portion of the Property.

10.     The CS Note provides:

> **Source of Interest and Principal Payments.**  Payment of Stated Interest, Participation Interest and Principal Amount shall be required to be paid only from Cash Available From Operations and Cash Available From Refinance or Sale.  In the event that there is insufficient Cash Available From Operations or Cash Available From Refinance or Sale to make the payments of Stated Interest, the shortfall shall accrue and shall be added monthly to the Principal Amount.

11.     The terms of the CS Note provide for a 12% Stated Interest rate and a 30% Participation Interest.  Under the CS Note, Carolina Shores is entitled to Participation Interest to the extent Cash Available from Operations or Cash Available from Refinance or Sale exceeds payments of the principal amount and stated interest.

12.     "Cash Available From Operations" is defined as:

> Gross cash receipts from operations of the [Debtor], less all operating expenses of the [Debtor], including, but not limited to, property management fees, operating costs of [Carolina Shores], the Asset Management Allowance, capital expenditures, reasonable reserves, and payments required on the Seller's Note or on any other loans which the [Debtor] may enter into in connection with the operation, development or refinance of the Property, but excluding Debt Service paid to [Carolina Shores].  The calculation

3

of Cash Available From Operations shall include any net proceeds the [Debtor] receives from the sale of club memberships and the receipt of dues from club members.

13.    "Cash Available From Refinance or Sale" is defined as:

Funds received by the [Debtor] from a refinance or sale of any or all of the Property, less any principal or interest payments or expenses the [Debtor] is then required to pay including real estate commissions or fees, but excluding Debt Service to [Carolina Shores], and less reasonable reserves.

14.    The CS Note further provides:  "[Debtor] shall not distribute any Cash Available from Operations or Cash Available From Refinance or Sale to any manager or member of the [Debtor] unless and until all required payments of Principal Amount and Stated Interest under this Note, which are then due and payable, have been paid."

15.    Pursuant to the CS Note, upon default or upon bankruptcy filing by Debtor, Carolina Shores may "declare the entire Note immediately due and payable."

16.    The CFC First Mortgage was satisfied on June 12, 2007, the satisfaction of which was recorded in Beaufort County on June 13, 2007.

17.    Some time after the execution of the CS Note and CS Mortgage, Dixon executed a promissory note in his favor to evidence a loan from Dixon to Debtor in the principal amount of $30,000,000.00 ("Dixon Note").  The Dixon Note is dated June 1, 2002.

18.    In April 2008, Debtor (through Dixon as a Member of Debtor) executed a Mortgage and Security Agreement in favor of Dixon,[2] recorded on April 23, 2008, in Beaufort County ("Dixon Mortgage").  The Dixon Mortgage indicates that it secures a $28,000,000 loan evidenced by "promissory notes delivered to [Dixon] from [Debtor]," and it encumbers all of the property that the CS Mortgage encumbers, as well as several parcels that the CS Mortgage does

---

[2] The Trustee filed Adversary Proceeding No. 09-80120 against Dixon on August 5, 2009, to avoid the Dixon Mortgage as a preferential transfer.  That action is currently pending.

not encumber.

19.    On January 20, 2009, Debtor filed a petition under Chapter 11 of the Bankruptcy Code.

20.    On March 30, 2009, Carolina Shores filed a secured proof of claim in the amount of $27,750,128.51.

21.    On March 30, 2009, Dixon filed a proof of claim in the amount of $34,692,660.58, subsequently amended on January 6, 2010 to claim the amount of $92,698,033.58. Of the amended amount, Dixon claims that $33,709,887.24 is secured, with the remaining amount being an unsecured claim.

22.    On August 21, 2009, Carolina Shores filed this adversary proceeding against Dixon and the Trustee seeking, among other relief, a declaratory judgment from this Court that the CS Mortgage has priority over the Dixon Mortgage.

23.    On September 8, 2008, Debtor borrowed $4,000,000.00 from AFG, LLC ("AFG"), secured by a mortgage encumbering the same property as the CS Mortgage. Carolina Shores entered into a subordination agreement with AFG (the "AFG Subordination Agreement"). The AFG Subordination Agreement subordinates the CS Mortgage to that of AFG and states that it is "for good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged." There is no mention in the AFG Subordination Agreement of the Dixon Mortgage or any priority of mortgage as between the Dixon Mortgage and the CS Mortgage.

24.    There is no recorded subordination agreement between Dixon and Carolina Shores.

## CONCLUSIONS OF LAW

**I.      Standard of Review**

Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment is a favored mechanism "to secure the 'just, speedy and inexpensive determination' of a case." In re Hovis, 325 B.R. 158, 163 (Bankr. D.S.C. 2005) (quoting Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1322-23 (4th Cir. 1995)).

When a motion for summary judgment is filed, the Court does not weigh the evidence but determines if there is a genuine issue for trial. Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)). Regardless of whether a movant "may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Once a moving party has made an initial showing that there is no genuine issue of material fact, the burden then shifts to the non-moving party to go beyond the pleadings and set forth affidavits, depositions, answers to interrogatories or admissions to show specific facts indicating a genuine issue for trial. Campbell v. Capital One Bank (In re Broughton), C/A No. 99-06953-W, Adv. Pro. No. 00-80143-W, slip op. at 4 (Bankr. D.S.C. Mar. 21, 2001).

## II.    <u>Arguments of the Parties</u>

Carolina Shores moves for summary judgment with respect to its first cause of action, which seeks a declaratory judgment as to the priority of secured claims of Dixon and Carolina Shores.   Carolina Shores first asserts the CS Mortgage was recorded prior to the Dixon Mortgage, and pursuant to S.C. Code Ann. § 30-7-10 which determines priority according to the time of filing for record, the CS Mortgage has priority over the Dixon Mortgage.   Secondly, Carolina Shores argues there is no valid subordination agreement which subordinates the CS Mortgage to the Dixon Mortgage.

Dixon does not contest either point made by Carolina Shores; instead, Dixon argues that the CS Note does not evidence a bona fide debt but an equity investment, and consequently, the CS Mortgage is a nullity and cannot have priority over Dixon's mortgage.

In its reply, Carolina Shores initially argues that Dixon should not be able to raise the new issue of reclassifying the CS Note as an equity investment in his response to Carolina Shores' motion.   Furthermore, Carolina Shores asserts that Dixon is estopped from raising this argument because he signed the proof of claim submitted by Carolina Shores in the underlying bankruptcy case, which identified the basis of the claim as "money loaned plus interest," which is "secured by a lien on the property;" because Dixon failed to deny the validity of the CS Mortgage in his Amended Answer; and because the Dixon Mortgage acknowledges the CS Mortgage as an existing lien on the Property.   Carolina Shores also argues that the CS Note evidences a bona fide debt, and that there is no legal support for Dixon's conclusion that a reclassification would nullify the CS Mortgage.

## III.    <u>Legal Analysis</u>

Dixon does not contest Carolina Shores' assertion that there is no valid subordination

agreement that subordinates the CS Mortgage to the Dixon Mortgage. Dixon also acknowledges that South Carolina is a "race notice" jurisdiction and under the priority rule of S.C. Code Ann. § 30-7-10, the CS Mortgage would take priority over the Dixon Mortgage because it was filed first. Therefore, the issue before the Court is whether the Dixon Mortgage, regardless of the order of the filing, has priority because the CS Mortgage secures an equity investment rather than a bona fide debt.[3]

### A. <u>Recharacterization of Claim</u>

The Fourth Circuit has recognized that a bankruptcy court's power to recharacterize a claim as an equity contribution is "essential to the implementation of the Code's mandate that creditors have a higher priority in bankruptcy than those with an equity interest." <u>Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)</u>, 453 F.3d 225, 233 (4th Cir. 2006). The factors a court should consider in determining whether to recharacterize a claim include:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

<u>Id.</u> at 233-34 (citing <u>Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)</u>, 269 F.3d 726, 749-50 (6th Cir. 2001)). The eleven-factor inquiry "var[ies] in application from case to

---

[3] The Court rejects Carolina Shores' estoppel arguments on the basis that Dixon filed Carolina Shores' proof of claim in his capacity as manager, rather than personally, and on the basis that Dixon's present arguments do not dispute the existence of the previously recorded CS Mortgage, but instead, the priority of Carolina Shores' claim.

case" and "[n]one of these factors is dispositive;" rather, the significance of each factor depends upon the circumstances.  Dornier, 453 F.3d at 234 (internal citations omitted).  Furthermore, the factors "are aimed at determining the intent of the parties at the time they entered into the loan transaction, which is the overarching inquiry in determining whether the true character of an investment is either a loan or an equity contribution."  Vieira v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.), 372 B.R. 796, 811 (Bankr. D.S.C. 2007).

## B.  **Application of the Factors**

Carolina Shores argues that a consideration of the factors weighs in its favor.  The Court agrees.  First, the CS Note was executed to evidence the indebtedness to Carolina Shores.  As this Court has previously found, "[t]he issuance of a . . . note is indicative of a bona fide indebtedness."  In re Atl. Littleneck Clamfarms, Inc., 211 B.R. 827, 834 (Bankr. D.S.C. 1997).  Additionally, although the CS Note does not provide for a schedule for payments, it does fix a maturity date of December 31, 2032, at a fixed rate of interest of 12%.

With respect to the source of repayments, the CS Note provides that payment is to be paid from Cash Available From Operations and Cash Available From Refinance or Sale.  While the Court has noted that "[i]f repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital," Carolina Shores' expectation of repayment under the CS Note did not depend "solely on the success of the borrower's business."  Id. at 835; Drake v. Franklin Equip. Co. (In re Franklin Equip Co.), 418 B.R. 176, 196 (E.D. Va. 2009).  Repayment to Carolina Shores was not purely speculative as Dixon asserts; rather, the CS Note provides for payment upon the maturity date or upon default or liquidation from the sale of the property.  The fact that repayment was effectively and contemporaneously secured by a lien on the Property weighs in favor of the CS Note constituting

debt. <u>Drake</u>, 418 B.R. at 196 ("All loans to a commercial borrower are initiated with the expectation they will be repaid from the earnings of the borrower, with the collateral securing the loan serving as a secondary source of repayment should earnings be insufficient to regularly pay the indebtedness. Even if the Debtor could only repay the . . . Note by surrendering the collateral does not mean the . . . Note was not a loan."). In this case, the CS Note clearly provides that the Property would serve as collateral securing Carolina Shores' right to repayment, and that repayment would be made upon the refinance or sale of the Property.

Additionally, despite any argument by Dixon that the Debtor was inadequately capitalized, Carolina Shores' transaction with the Debtor consisted of a one-time, sum-certain loan as evidenced by the CS Note. Carolina Shores did not provide continued capitalization to keep Debtor's business afloat.[4] The transaction also appears to be more consistent with a loan because Carolina Shores does not have any formal ownership interest in the Debtor, and therefore, there is no connection between any ownership interest and the amount of the loan. <u>See Atl. Littleneck Clamfarms</u>, 211 B.R. at 836 ("If advances are made by stockholders in proportion to their respective stock ownership, an equity capital contribution is indicated.").

The CS Note also clearly provides that it is secured by a second mortgage on the Property; thus, the presence of security for repayment indicates that the CS Note evidenced a debt and not equity. The Court further agrees with Carolina Shores that it appears that financing was available from other entities since Debtor obtained financing from CFC in its initial acquisition of the Property. <u>See id.</u> at 837 ("If a corporation is able to borrow funds from outside sources at the time the transaction is made, the transaction has the appearance of bona fide indebtedness."). The extent to which the CS Note was subordinated to outside creditors' claims

---

[4] The Court notes that other lenders, such as AFG, did provide ongoing capital to the Debtor during this time.

similarly does not weigh in Dixon's favor.  While the CS Mortgage was an assignment of an existing second mortgage on the Property, subordinate to the CFC First Mortgage, the CS Mortgage moved into first lien position once the CFC First Mortgage was satisfied.  Thereafter, the CS Mortgage was subordinated only to the mortgage of AFG by a subordination agreement in exchange for consideration.  Although the CS Note provides for payment out of cash flow, it also provides for payment upon refinance or sale of the Property, which does not require payment to other creditors before payment to Carolina Shores.

The final two factors do not appear to weigh heavily in either direction.  Pursuant to the PPM and Carolina Shores Memo, the money loaned from Carolina Shores was intended to provide partial funding for the purchase of the Property, for which Carolina Shores was granted a security interest, and to provide for operating expenditures and operational contingencies.  Therefore, while the loan was used in part to acquire capital assets, it was also used to meet the daily operating needs of the Debtor.  See Drake, 418 B.R. at 200 (quoting AutoStyle Plastics, 269 F.3d at 752) ("Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of a bona fide indebtedness.").  Finally, there is no dispute that Debtor did not have a sinking fund for repayment of the CS Note.  Nevertheless, it has been found to be unusual "where the borrower is a smaller, non-publicly traded entity" for a lender to require the establishment of a sinking fund.  Drake, 418 B.R. at 200.  The "pledging of collateral for repayment of the [CS Note] by the Debtor also mitigates the absence of a sinking fund."  Id. at 200-01.

The Court acknowledges that a few aspects of the CS Note might suggest a capital contribution was made, such as the participation interest after the debt was paid; however, after fully considering the Dornier factors and the circumstances of the transaction, the Court

concludes that the CS Note is more consistent with a loan.

Aside from an application of the eleven factors, the Court cannot agree with Dixon's conclusion that even if a reclassification of the CS Note as equity was warranted, it would nullify the CS Mortgage.  In his response to Carolina Shores' Motion, Dixon cites <u>McCaughrin & Co. v. Williams</u>, 15 S.C. 505 (1881) for the premise that such a reclassification would render the CS Mortgage a nullity.  The <u>McCaughrin</u> court found that "where the mortgage does not undertake within itself to specify and reasonably ascertain the debt, that debt must be fixed elsewhere, because the mortgage is executed for the sole purpose of securing the debt, and, therefore, when there is nothing fixing the debt, the mortgage is a nullity." <u>Id.</u>  However, the Court finds the <u>McCaughrin</u> case is distinguishable because it involved a mortgage that was executed without consideration as there was no evidence of any indebtedness prior to the execution of the mortgage, and the mortgage itself did not specify any debt.  In the present case, the CS Mortgage secures the debt fixed by the CS Note.  Accordingly, the Court is not persuaded that even if a consideration of the <u>Dornier</u> factors merited a reclassification of the CS Note that the CS Mortgage would be rendered void.

**IV.    <u>Conclusion</u>**

Based on the foregoing, the Court finds that reclassification of the CS Note is not warranted, and since there is no dispute regarding the law regarding priority of mortgages or the order of the recording of the mortgages, the CS Mortgage has priority over the Dixon Mortgage.  Because the Court finds that no genuine issue of material fact has been presented, summary judgment is appropriate, and the Motion is granted.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
February 25, 2010